BURKHALTER KESSLER CLEMENT & GEORGE LLP
Alton G. Burkhalter, Esq., Bar No. 119594
Email: aburkhalter@bkcglaw.com
Daniel J. Kessler, Esq. Bar No. 173710
Email: dkessler@bkcglaw.com
Joshua A. Waldman, Esq., Bar No. 222859
Email: jwaldman@bkcglaw.com
2020 Main Street, Suite 600
Irvine, California 92614
Telephone: (949) 975-7500
Facsimile: (949) 975-7501

Attorneys for Plaintiff Call Delivery Systems, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Call Delivery Systems, LLC, a California limited liability company<br><br>Plaintiff,<br><br>vs.<br><br>Daryl Morgan, an individual; Call Haven Partners, LLC, a California limited liability company<br><br>Defendant. | Case No.<br><br>**CIVIL ACTION COMPLAINT FOR:**<br><br>1. **DEFEND TRADE SECRETS ACT**<br>2. **UNIFORM TRADE SECRETS ACT**<br>3. **BREACH OF FIDUCIARY DUTY OF LOYALTY**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Call Delivery Systems, LLC ("CDS" or "Plaintiff"), in its Complaint against Defendants, Daryl Morgan ("Morgan") and Call Haven Partners, LLC ("Call Haven") (collectively "Defendants"), alleges as follows:

## I.   INTRODUCTION

1. When the phone rings and it's a wrong number, many people are annoyed. Not so at CDS. CDS's highly specialized business involves monetizing misdialed telephone calls, particularly misdialed toll-free numbers. Using its proprietary call routing software platform and complex algorithms, CDS instantaneously routes millions of misdialed calls from its suppliers to different buyers who market and sell a wide variety of products and services. CDS's unique business systems, aggregation of confidential data, and trade secrets are critical to its operations, especially information relating to its needle in a haystack, top revenue producing "shooting stars" toll-free numbers.

2. Defendant Morgan was previously employed as CDS's second-highest paid employee. As Chief Technology Officer ("CTO"), Morgan was the primary architect of CDS's software and algorithms. He negotiated the confidential contract terms contained in agreements with CDS's suppliers, he was privy to confidential terms with buyers, and he was entrusted with virtually all of CDS's confidential and proprietary information.

3. Without providing any advance notice, Morgan abruptly resigned his employment on March 3, 2020.Unbeknownst to CDS, Morgan was secretly taking steps to establish a new, competing business, Defendant Call Haven. It is now clear that Morgan has used CDS's trade secrets to steal several of CDS's most valuable suppliers and buyers. Perhaps most egregiously, Morgan has replicated and is selling CDS's proprietary toll-free number algorithm, and Morgan is systematically cherry-picking CDS's carefully guarded shooting stars toll-free numbers.

4. Morgan has caused and will continue to cause substantial and irreparable harm to CDS. Indeed, if left unchecked, Morgan threatens to put CDS out of business.

## II.   PARTIES

5. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6. CDS is a California limited liability company with its principal place of business located at 8619 Washington Boulevard, Culver City, California 90232.

7. Defendant Morgan is an adult individual who resides at 3143 Bianca Circle, Simi Valley, CA 93063.

8. Defendant Call Haven is a California limited liability company with its principal place of business located at 728 Wind Willow Way, Simi Valley, CA 93065.

## III.   JURISDICTION AND VENUE

9. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

10. This Court may properly maintain jurisdiction over Defendants because: (a) both Morgan and Call Haven reside within California; and (b) Defendants' contacts with the Central District of California are sufficient for the exercise of jurisdiction over Defendants, satisfying the standard set forth by the Supreme Court of the United States in *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945).

11. This Court has original subject matter jurisdiction over Count I, pursuant to 28 U.S.C. § 1331 because that Count arises under the laws of the United States.

12. This Court has supplemental jurisdiction over Counts II and III pursuant to 28 U.S.C. § 1367.

## IV. FACTS

### A. The Evolution of CDS's Specialized Business

13. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

14. Scott Richards ("Richards") is the Chief Executive Officer ("CEO") of three related business entities: Lemonade, LLC ("Lemonade"); CDS; and Reconnect Research, LLC ("RR").

15. Lemonade does not operate its own business. It functions like a holding company.

16. Lemonade previously held another business named Dial800, LLC ("Dial800").

17. Lemonade sold Dial800 to a third-party in October 2017.

18. In 1996, Richards became the CEO of Dial800.

19. Dial800'sbusiness involved providing its customers with memorable toll-free numbers, call routing services, and call tracking services.

20. Dial800 owned tens of thousands of toll-free telephone numbers, including numbers that could be used as memorable numbers like "1-800-FLOWERS". Some of Dial800's customers licensed these memorable toll-free numbers.

21. Other customers licensed a number of unique toll-free numbers from Dial800 because they wanted to utilize them in different forms of media and advertising and track their results. With respect to these customers, in addition to licensing the numbers, Dial800 provided services, including routing incoming calls to multiple call centers and keeping track of data regarding the calls. For example, Dial800 tracked the length of each call and the revenue generated from these calls.

22. Collectively, the unassigned toll-free numbers held by Dial800 (i.e., the numbers not being used by any entity) received thousands of incoming misdialed calls. In other words, individuals were dialing the wrong phone numbers. Instead of

reaching the party they were intending to call, they were actually dialing and being connected with one of Dial800's unassigned numbers.

23. Richards decided that he wanted to monetize all of the misdialed calls being received by Dial800. To achieve this goal, he started a new business in 2013 and formed CDS in January 2014.

**B.    CDS's Buyers, Suppliers, and Trade Secrets**

24. CDS routes misdialed calls to buyers. CDS's buyers include a variety of businesses in different industries, including but not limited to companies selling cruise vacations, airline tickets, auto insurance, and legal services.

25. The success rate, i.e., the number of callers who wind up making a purchase, varies greatly depending upon the buyer's industry and the specific toll-free number.

26. Quality buyers are very hard to come by. CDS currently has approximately 15 buyers. Many of the buyers were generated by Richards' personal contacts. Others were developed by consistent marketing efforts and attending trade shows.

27. CDS negotiates different terms with all of its buyers. Buyers pay based upon a rate per call or a rate per minute for the calls routed to them.

28. Before the COVID-19 pandemic, CDS was routing several million misdialed calls in a typical month. Less than 10% of these misdialed calls were placed to numbers owned by CDS. The rest of the misdialed calls were placed to numbers held by CDS's suppliers.

29. Collectively, CDS's suppliers own thousands upon thousands of telephone numbers, including toll-free numbers. CDS currently has approximately 35 suppliers.

30. CDS's suppliers provide misdialed calls to CDS so that they can be monetized, i.e., sold to one of CDS's buyers. CDS negotiates different payment terms with each of its suppliers. For example, CDS and a supplier may agree to evenly split the

revenue generated by misdialed calls, or they may agree that the supplier will be paid based solely upon call volume and duration.

31. Over the years, CDS has invested heavily in its technology and the development of its unique business methods.

32. Misdialed calls have a shelf-life of only a few brief moments. Incoming misdialed calls need to be re-routed to buyers almost instantaneously or else they lose all of their value. Working with an outsourced telecommunications computer programming company called Novelty Soft, CDS developed a unique and proprietary computer software system to route misdialed calls and to track a large amount of different data points, including call length, revenues generated, and payments owed to and by suppliers and buyers.

33. By way of further example, CDS developed a unique and proprietary Toll-Free Number Algorithm ("TFNA"). TFNA analyzes the countless different ways that an individual could misdial a given number.

34. CDS utilizes this data to assemble a target list of toll-free numbers to obtain from a pool or database that is released every evening by an organization known as SOMOS.

35. In other words, CDS invested heavily in TFNA so that it can be used as a tool to acquire profitable toll-free numbers as they are made available by SOMOS.

36. For a period of approximately five years, CDS invested in updating and improving the algorithm used in TFNA.

37. The ongoing success of CDS's business rests not only upon its proprietary technology and systems, such as its routing software and TFNA, but also upon its confidential information and trade secrets. The identity and business terms with each of CDS's suppliers and buyers is held in the strictest of confidence.

38. Generally speaking, CDS's contracts with its suppliers and buyers is not exclusive and can be terminated by either party at any time and for any reason. Thus, if one of CDS's competitors learned about the specific terms that it has with any given

supplier or buyer, it could attempt to steal these opportunities from CDS by offering marginally better terms.

39. Of particular importance in terms of trade secrets is knowing where a particular supplier's calls are routed. With rare exception, no one outside of CDS – not its suppliers, buyers, or competitors – knows to which buyer a particular supplier's calls are sent. This is truly part of CDS's "secret sauce".

40. Another major trade secret involves CDS's "shooting stars" numbers. Information about shooting stars is held in the utmost of confidence, and, with rare exception, is not shared with anyone outside of CDS, including suppliers, customers, or competitors.

41. Suppliers typically supply to CDS misdialed calls from thousands of different telephone numbers. Using its proprietary systems and software, CDS has determined that misdialed calls to a small handful of these thousands of numbers are worth their weight in gold. The misdialed calls from these few numbers – called "shooting stars" – consistently generate substantial amounts of revenue and profit for CDS and its suppliers and buyers.

42. With rare exception, CDS does not let its suppliers know which of its numbers are "shooting stars" because its suppliers could then shop these valuable numbers around to CDS's competitors. If a supplier had the ability to identify and pull shooting stars out of a large batch of thousands of numbers, CDS would be substantially harmed because it could be left with routing and selling only the larger number of relatively less profitable calls (which would involve more work for less return).

43. Including Richards, CDS has only four employees. CDS entrusts each of its employees with a substantial amount of its trade secret information and expects that its employees will use that information only for the benefit of the company.

C. **Reconnect Research**

44. RR is another company held by Lemonade. RR essentially functions as one of CDS's buyers.

45. Instead of selling or advertising like most of CDS's buyers, RR uses misdialed calls to conduct telephone surveys for a variety of different customers in different industries. Unlike most telephone surveying businesses who place outgoing call to conduct surveys, RR utilizes misdialed incoming calls routed from CDS.

46. RR is the only company in the world conducting telephone surveys using this method.

**D.     Defendant Morgan's Employment at CDS and His Access to Trade Secrets**

47. Richards initially hired Morgan to work as a Telecom Manager for Dial800 in March 2009.

48. After approximately five (5) years, Morgan began working for CDS. From that point forward, Morgan spent the vast majority of his working time performing work for CDS. He also spent some of his time on matters related to RR's business.

49. Before he resigned, Morgan was CDS's Chief Technology Officer ("CTO"). He was CDS's second-highest paid employee (second only to Richards, the CEO). He received a base salary of $150,000.00 in addition to a comprehensive fringe benefits package.

50. Over the years, Morgan would express frustration to Richards about his role in the company. He didn't understand why he and the other employees would do all of the work and operate the companies, and the owners of the company would retain the profits. He did not appreciate the fact that the owners made a substantial investment in the companies and that they were entitled to realize a profit from their investment.

51. Morgan was deeply involved in virtually all aspects of CDS's business. He was particularly involved with identifying, negotiating with, and managing CDS's suppliers. He was personally responsible for negotiating terms with suppliers.

52. As CDS's CTO, Morgan played a significant role in the management of CDS, and exercised discretion in implementing policies, procedures, and protocols, especially with respect to CDS's technology and infrastructure.

53. As CDS's CTO, Morgan was the primary architect of CDS's routing technology and procedure. He worked hand-in-hand with the outsourced software company, NoveltySoft, to develop the platform that lies at the heart of CDS's business and that is used to route misdialed calls from suppliers to buyers, and to track all of the data points that are essential to CDS's success.

54. As CDS's CTO, Morgan conceived of and developed the TFNA described above. He was the lead in this regard. For a period of approximately five years, as CDS's CTO, Morgan updated and improved the algorithm used in TFNA. The unique and confidential TFNA used by CDS was an integral part of CDS's success.

55. Not only did Morgan play a central role in developing all of CDS's trade secrets, confidential information, and proprietary systems, he was entrusted as the custodian of CDS's confidential data regarding specific suppliers, buyers, and telephone numbers. He had access to all of the data and contract terms regarding suppliers and buyers. And he was privy to highly confidential and difficult to develop information about specific telephone numbers and misdialed calls, including the aforementioned "shooting stars".

56. In fact, as the CTO, Morgan was emphatic when speaking with other CDS employees about the critical importance of keeping all information about shooting stars strictly confidential, and not sharing any shooting stars-related information with suppliers.

57. To be completely accurate, it should be noted that one of CDS's suppliers is provided with data about particular calls and number. But this supplier is an aberration.

**E.  Morgan Uses CDS's Trade Secrets to Establish a Competing Business and Steal Suppliers, Buyers, Shooting Stars Numbers, Proprietary Software, and the Proprietary TFNA**

58. Morgan voluntarily resigned his employment without providing any advanced notice. His last day of work was March 3, 2020.

59. During the months preceding Morgan's resignation, Lemonade's owners had entered into an agreement providing a third-party with an option to purchase a majority interest in CDS and RR.

60. Following a recommendation made by the prospective purchaser, CDS made some changes to its business in January and February of 2020. Specifically, CDS conducted an examination of the products and services being sold by its buyers and decided to drop those products and services that provided little or no value to the consumer public. This resulted in CDS telling some of its suppliers and buyers that the payouts would be reduced as CDS reorganize where it send calls. By no stretch of the imagination, however, did CDS discontinue any of its lines of business. Instead, these changes were implemented by Richards and the owners to make CDS a stronger, healthier business over the long term.

61. As set forth immediately below, Morgan secretly set up a competing business, he began engaging in competitive activities prior to March 3, 2020 (i.e., while he was still employed by CDS as its Chief Technology Officer), and he has utilized CDS's confidential information and trade secrets to steal many of CDS's most valuable suppliers, buyers, and numbers (including targeting shoot stars numbers).

62. The name of Morgan's competing business is Call Haven Partners, LLC.

63. Over a month before his last day of work, on January 30, 2020, Morgan registered the domain name www.CallHavenPartners.com.

64. On February 10, 2020, Morgan filed articles of organization to form Call Haven.

65. On April 1, 2020, Morgan setup a website with following domain name: www.cheapairlineflighttickets.com. He is using this website to sell airline misdials. Prior to the COVID-19 pandemic, airline misdials was the most profitable shooting star category for CDS. Morgan was entrusted with this information about CDS's business as CDS's CTO.

66. Jodi Carrier ("Carrier") is an individual who was engaged by CDS to utilize her network of contacts and identify potential suppliers. On her LinkedIn account, Carrier now identifies herself as a Vice President for Call Haven.

67. Upon information and belief, Morgan contacted Carrier about working for Call Haven prior to March 3, 2020, i.e., while Morgan was still employed by CDS.

68. At Morgan's direction, Carrier has caused a supplier (referred to herein as Supplier No. 1 to preserve confidentiality) to stop supplying numbers to CDS and to supply those same numbers to Call Haven.

69. When converting Supplier No. 1's business, Morgan and Carrier were in a position to engage in unfair competition with CDS. This is true because of Morgan's inside knowledge about Supplier No. 1's numbers and contract terms with CDS. Morgan also used confidential information about Supplier No. 1's revenues and profits. None of this information is generally available to the public or to any of CDS's competitors.

70. As noted above, not only did Morgan have access to CDS's proprietary TFNA, he was primarily responsible for developing it as CDS's CTO.

71. Richards has learned that Morgan, through his new company, Call Haven, is replicating CDS's TFNA for another business, a former CDS supplier referred to herein to as Supplier No. 2. In other words, Morgan is actively stealing the TFNA system and selling it to Supplier No. 2.

72. Morgan is still in possession of all of CDS's confidential and proprietary information. Much of this information resides on Morgan's computer, which he retained after he resigned his employment.

73. As mentioned above, based upon the conversations that Richards had with Morgan over the years, it is believed and therefore averred that Morgan does not understand basic principles of business. He fails to recognize that he was paid a handsome salary by CDS to develop the TFNA and other proprietary systems and that TFNA and the other systems belong to CDS and not to him (personally) even though he

was primarily responsible for developing some of them as CTO.

74. Based upon a recent conversation between Richards and a buyer, it is believed and therefore averred that Morgan has successfully caused another CDS supplier, Supplier No. 3, to stop doing business with CDS and give its numbers to Call Haven. In that regard, Supplier No. 3 was the owner of a very valuable number receiving misdials to a large issuer of credit cards. This single number generated a substantial revenue, like clockwork. This single number benefitted CDS and its client, and increased the overall profitability of CDS's portfolio.

75. Morgan knew the terms of CDS's agreement with Supplier No. 3, he knew about Supplier No. 3's shooting star number, and he used this for his benefit and to the detriment of CDS. Indeed, Morgan had negotiated terms with Supplier No. 3 on behalf of CDS on a regular basis. Supplier No. 3 had been a long-time business partner of CDS, and over the years had been both a supplier and buyer of misdialed call traffic.

76. Upon information and belief, Morgan would have had to contact Supplier No. 3 prior to his last day of employment in order to steal all of this business in such a short amount of time.

77. Supplier No. 4 stopped doing business with CDS on April 1, 2020. Initially, CDS's relationship with Supplier No. 4 had been developed by Morgan. Supplier No. 4 took all of its numbers and went elsewhere. Supplier No. 4 indicated that it was shopping its numbers elsewhere, and it is believed and therefore averred that Supplier No. 4 is now providing all of its numbers to Morgan at Call Haven.

78. Supplier No. 5 stopped doing business with CDS on March 25, 2020. Supplier No. 5 left without any explanation, and it is believed and therefore averred that Supplier No. 5 left so that it could conduct business with Morgan at Call Haven.

79. Supplier No. 6 left in April. After calling some of the numbers that Supplier No. 6 provided to CDS, it is clear that those numbers are being routed to the same buyer, a CDS buyer referred to herein as Buyer No. 1. Based upon these facts, it is clear that not only has Morgan stolen CDS's suppliers, but he is taking suppliers' calls

and routing them to the same buyers where CDS had routed those calls. No competitor would be able to achieve this without Morgan's inside knowledge of CDS's systems, call data, methods, and contract terms.

80. Supplier No. 7 left on February 24, 2020. Notably, this is approximately one week prior to Morgan's last day of employment at CDS. Like the other suppliers who have stopped doing business with CDS, Supplier No. 7 has indicated that it is getting paid more money for providing their call traffic.

81. Clearly, Supplier No. 7 was taken by Morgan. It is equally clear that Morgan solicited Supplier No. 7 while he was still an employee of CDS.

82. Supplier No. 8 presents a similar scenario. When Richards asked Supplier No. 8 why he was leaving, Supplier No. 8 said that it wasn't allowed to tell but suggested that it was being paid more money for calls.

83. Supplier No. 9 left on March 18, 2020. It is believed and therefore averred that Morgan solicited Supplier No. 9 prior to his last date of work.

84. Notably, when targeting CDS's suppliers, it is very clear that Morgan is focusing on CDS's shooting star numbers.

85. As explained above, the identification of shooting stars numbers is so confidential that (with rare exceptions) CDS does not even share this information with suppliers. Yet since Morgan's departure, one after another, CDS's suppliers are pulling either all or some of their number or just their shooting star numbers.

86. Morgan is one of the very few people who possess this information outside of CDS, and it is clear that he is responsible for suppliers taking away their highly profitable shooting star numbers.

87. As noted above, suppliers of misdialed numbers are extremely difficult to find. Identifying suppliers, and especially their shooting star numbers, is a process that CDS has invested in heavily. This information is perhaps the company's most carefully guarded trade secret, and Morgan is now using that insider knowledge against CDS.

88. The call volume for shooting start numbers is relatively low, but the payout per call can be very substantial.

89. On April 26, 2020, a supplier pulled shooting stars numbers related to auto insurance and airline ticketing.

90. On April 28, 2020, because of Morgan, CDS lost a supplier's shooting star numbers related to an auto insurance provider and credit card issuer.

91. During the week of May 11, 2020, another supplier pulled a shooting star number related to airline ticketing.

92. In some instances, suppliers have asked CDS to pay more for their shooting star numbers, effectively creating a bidding war that was never even a possibility previously.

93. On or about May 15, 2020, another CDS supplier pulled yet another airline ticketing shooting star.

94. Based upon the forgoing, Richards directed CDS's attorneys to send a letter to Morgan demanding that he cease and desist.

95. Without justification or excuse, Morgan, by and through his attorney, has refused to do so. Instead, he has insisted that he has done nothing wrong.

96. Without an injunction from the Court to put an end to Morgan's unlawful conduct, CDS will continue to suffer irreparable harm, including loss of good will, reputation, and an indeterminate amount of business and volume from suppliers and buyers.

97. Without intervention by the Court, Morgan will continue to utilize CDS's confidential information, contract terms, call data, systems, platform, and other trade secrets for his own benefit and to the detriment of CDS.

98. In very short order, Morgan's continuing unlawful conduct with threaten the viability of CDS as an ongoing business concern.

## V.  COUNT I
## THE DEFEND TRADE SECRETS ACT

99.   The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

100.   The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, broadly defines the term "Trade Secrets" to include all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, where: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

101.   CDS's trade secrets are comprised of, *inter alia*, its supplier and buyer lists, pricing information and contract terms, information and data about toll-free numbers, algorithms including TFNA, proprietary software including its call routing software developed, in part, by NoveltySoft, marketing strategies, and information about shooting stars toll-free numbers, all of which were acquired and developed at great cost to CDS and constitute "Trade Secrets" within the meaning of that term under the DTSA.

102.   These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

103.   These trade secrets are the exclusive property of CDS, have been maintained in secrecy by CDS, are not known to the public or within CDS's industry and are of great pecuniary value to CDS.

104.   CDS entrusted its trade secrets to Morgan as the highly compensated Chief Technology Officer of CDS and for the exclusive purpose of benefitting CDS.

14
COMPLAINT

105. CDS derives independent economic value from its trade secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of CDS's trade secrets.

106. Morgan had a duty to refrain from misusing or misappropriating CDS's trade secrets that were entrusted to him because they are exclusive property of CDS.

107. Morgan breached his duty to CDS by intentionally, knowingly, and by wrongful and improper means, misappropriating CDS's trade secrets for his personal benefit and the benefit of his new company, Call Haven.

108. The DTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of CDS's trade secrets. *See* 18 U.S.C. § 1836(b)(3).

109. Furthermore, unless Defendants are enjoined from using and disclosing CDS's trade secrets, the value of a substantial part of CDS's business will be irreparably harmed.

110. As a direct and proximate result of Morgan's misappropriation of CDS's trade secrets, CDS has suffered, and continues to suffer, immediate irreparable injury, for which CDS has no adequate remedy at law.

111. In addition to the irreparable injury described above, as a direct and proximate result of Morgan's wrongful conduct, CDS has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

112. Morgan has acted with wanton, willful, malicious, and/or reckless indifference, and as a result, is liable for punitive damages under the DTSA.

# VI.   COUNT II
## CALIFORNIA UNIFORM TRADE SECRETS ACT

113.   The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

114.   The California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.*, broadly defines the term "Trade Secret" to include all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, where: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

115.   CDS's trade secrets, as described above, constitute "Trade Secrets" as that term is broadly defined under the CUTSA.

116.   These trade secrets would be difficult, expensive, and time-consuming to duplicate independently, if they could be at all.

117.   These trade secrets are the exclusive property of CDS, have been maintained in secrecy by CDS, are not known to the public or within CDS's industry and are of great pecuniary value to CDS.

118.   CDS entrusted its trade secrets to Morgan as a highly compensated employee of CDS and for the exclusive purpose of benefitting CDS.

119.   CDS derives independent economic value from its trade secrets not being generally known or readily ascertainable by proper means to third parties that could obtain economic value from the use of CDS's trade secrets.

120.   Morgan had a duty to refrain from misusing or misappropriating

CDS's trade secrets that were entrusted to him because they are exclusive property of CDS.

121. Morgan breached his duty to CDS by intentionally, knowingly, and by wrongful and improper means, misappropriating CDS's trade secrets for his personal benefit and the benefit of his new company, Call Haven.

122. The CUTSA expressly authorizes this Court to enjoin Defendants from any actual or threatened misappropriation of CDS's trade secrets. See Cal. Civ. Code § 3426.2.

123. Furthermore, unless Defendants are enjoined from using and disclosing CDS's trade secrets, the value of a substantial part of CDS's business will be irreparably harmed.

124. As a direct and proximate result of Morgan's misappropriation of CDS's trade secrets, CDS has suffered, and continues to suffer, immediate irreparable injury for which CDS has no adequate remedy at law.

125. In addition to the irreparable injury described above, as a direct and proximate result of Morgan's wrongful conduct, CDS has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

## VII.   COUNT III
## BREACH OF FIDUCIARY DUTY OF LOYALTY

126. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

127. Pursuant to Morgan's employment relationship with CDS as its second-highest level employee, he was placed in a position of trust regarding CDS's operations, employees, buyers, suppliers, confidential information, and trade secrets.

128. As CDS's Chief Technology Officer, Morgan participated in management of CDS and maintained discretionary authority in that capacity, including

the discretion to implement policies, procedures, and protocols.

129. Based upon his employment relationship and position of trust within CDS as its Chief Technology Officer, Morgan owed a fiduciary duty to act solely for CDS's benefit.

130. While Morgan was still employed by CDS, without CDS's knowledge or consent, Morgan engaged in misconduct, including establishing a competing business and soliciting suppliers and buyers.

131. Morgan has used and will continue to use CDS's confidential information for the benefit of himself and Call Haven.

132. Morgan's aforementioned misconduct constitutes a breach of the duty of loyalty owed to Morgan to CDS.

133. As a direct and proximate result of Morgan's wrongful conduct described herein, CDS has sustained and will continue to sustain immediate and irreparable harm and injury for which it has no adequate remedy at law.

134. In addition to the irreparable injury described above, as a direct and proximate result of Morgan's wrongful conduct, CDS has suffered and/or will suffer actual and/or consequential damages, including loss of competitive business advantage, opportunity, and/or expectancy.

135. Morgan has acted with wanton, willful, malicious, and/or reckless indifference, and as a result, is liable for punitive damages.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury on all claims so triable.

## IX. PRAYER FOR RELIEF

Plaintiff demands the entry of a judgment in favor of Plaintiff and against Defendants providing the following relief:

A.  An injunction ordering that Morgan may not, directly or indirectly, for a two (2) year period following the date of a final Order in this case: (a) be employed by or perform work of any kind for a competitor of CDS, including Call Haven; (b) induce, offer, contact, solicit, encourage, conduct business with, or suggest to any of CDS's current or former suppliers or buyers that they should cease doing business, in whole or in part, with CDS and/or commence doing business with Morgan or Call Haven and/or with another person or entity that offers or provides services similar to those that CDS offers, provides and/or has the capability of providing; and/or (c) interfere or attempt to interfere with any prospective business or contractual relationship between CDS and its suppliers or buyers;

B.  Compensatory damages, including without limitation lost profits and all damages resulting from Morgan's breach of his statutory and common law obligations;

C.  An accounting and equitable disgorgement for a payment to CDS of all profits and earnings of Call Haven resulting from Morgan's conduct;

D.  Statutory and exemplary damages for violation of the Defendant Trade Secrets Act and the California Uniform Trade Secrets Act;

E.  Attorney's fees as provided under the Defend Trade Secrets Act and the California Uniform Trade Secrets Act;

F.  Punitive damages against both Morgan and Call Haven; and

G.  Such other or further relief as the Court may determine is necessary to provide complete relief for CDS resulting from Defendants' violations of law.

Dated:     May 22, 2020

**BURKHALTER KESSLER CLEMENT & GEORGE LLP**

By: /s/ Joshua A. Waldman
Alton G. Burkhalter
Daniel J. Kessler
Joshua A. Waldman
*Attorneys for Plaintif*