1
2
3
4
5
6
7
8

*Law Office Of*
**MICHAEL P. RING**
    AND ASSOCIATES
Michael P. Ring, State Bar #95922
mpr@ringlaw.net
Jesse T. Farris, state Bar #250864
jessefarris74@gmail.com
1234 Santa Barbara Street
Santa Barbara, CA 93101
(805) 564-2333 TEL
(805) 564-8899 FAX

ATTORNEY FOR DEFENDANTS

9
10
11

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Call Delivery Systems, LLC, a California limited liability company**

    **Plaintiff**

    **v.**

**Daryl Morgan, an individual; Call Haven Partners, LLC, a California limited liability company,**

    **Defendants**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case 2:20-cv-04637-CBM-PD**

**DEFENDANTS DARYL MORGAN, AND CALL HAVEN PARTNERS, LLC'S TRIAL BRIEF**

**DATE:**     **03/30/22**
**TIME:**     **10:00 A.M.**
**COURTROOM:  TBA**

 **Honorable Consuelo B. Marshall**

# **TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION AND STATEMENT OF FACTS | 1 |
| | a. Morgan's Departure from CDS | 1 |
| | b. Call Haven Partners, LLC and Allegations of Misappropriation | 2 |
| | c. Defendants Have Not Misappropriated Anything and Plaintiff's Alleged Damages, If they Exist, Are Self Inflicted | 4 |
| |    i. *Facts Re: CDS Loss of Revenue* | 4 |
| |    ii. *CDS'S Allegations of Proprietary Trade Secrets Do Not Withstand Scrutiny* | 5 |
| |       1. Routing Technology | 5 |
| |       2. Toll-Free Number Algorithm | 6 |
| |       3. Former CDS Suppliers/Pricing | 8 |
| II. | PLAINTIFF'S CAUSES OF ACTION | 9 |
| | a. Defend Trade Secrets Act ("DTSA") | 9 |
| |    i. *Prima Facie Element of the DTSA: Defining "Trade Secret"* | 9 |
| |    ii. *Damages* | 10 |
| | b. Uniform Trade Secrets Act ("UTSA") | 11 |
| |    i. *Client and Customer Lists as Trade Secrets* | 11 |
| | c. Alleged Spoliation of Evidence | 12 |
| | d. Breach of Fiduciary Duty of Loyalty | 13 |
| III. | MORGAN'S COUNTERCLAIMS | 14 |
| | a. Morgan Is Entitled to Paid Time Off ("PTO") | 14 |
| | b. Morgan Is Entitled To A Fact Determination On Waiting Time Penalties | 17 |
| | c. Morgan's Breach of Contract Action | 18 |

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                      <u>Page</u>

*02 Micro Inter. Ltd. v. Monolithic Power Systems, Inc*., 399                    10

F.Supp.2d 1064 (N.D. Cal. 2005)

*Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1, 7.                 18

*Church v. Jamison* (2006) 143 Cal.App.4th 156                                  17

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482           13

F.3d 1091, 1097 (9th Cir. 2007)

*K.C. Multimedia, Inc. v. Bank of Am. Tech. and Operations, Inc*., 171         14

Cal.App. 4th 939, 958 (2009))

*Kerr's Catering Service v. Department of Industrial Relations* 57             17

Cal.2d 319, 326, (1962)

*Leatt Corp. v. Innovative Safety Tech., LLC*, 2010 W.L. 1526382               11

(2010)

*Lopez v. United Parcel Service, Inc.*, 2010 WL 728205; (N.D. Cal.            18

2010)

*MAI Systems Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir.            11

1993)

*Mamika v. Barca* 68 Cal.App.4th 487, 493 (1998)                             18

*Mattel, Inc. v. MGA Ent., Inc*., 782 F.Supp. 2d 911, 986 (C.D. Cal.         14

2011).

*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47           14, 16, 17

Cal.App.5th 243

*Owen v. Macy's, Inc.,* 175 Cal.App.4th 462, 468, (2009)           14

*Religious Technology Center v. Netcom On-Line Communication*        7,11

*Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995)

*Steinberg Moorad & Dunn Inc., v. Dunn,* 136 Fed.Appx. 6,          12

2005 WL 712487, at * 12 (Cal. 2005)

*Suastez v. Plastic Dress-Up Co.* 31 Cal.3d 774 (1982)          15, 16

*Troester v. Starbucks Corporation* 387 F.Supp.3d 1019, 1030, (C.D.      18

Cal. 2019)

*Villalpando v. Exel Direct Inc.* 2015 WL 5179486, at *36 (N.D.        18

Cal., Sept. 3, 2015, No. 12-CV-04137-JCS)

*Weride Corporation v. Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal.     10, 13

2019)

*Whiteslate, LLP v. Dahlin*, No. 20-CV-1782 W (BGS) (S.D. Cal.        14

July 7, 2021)

*Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir. 1983)     13

Statutes                                                    Page

18 U.S.C. § 1836                                             7, 9

18 U.S.C. § 1839                                             9, 10

Cal. Civil Code § 1984                                      11

Cal. Labor Code § 203                                    17, 18

Cal. Labor Code § 227.3                        14, 15, 16, 17

# I.

## INTRODUCTION AND STATEMENT OF FACTS

Defendant Daryl Morgan (herein "Morgan") has worked in the telecommunications industry for 20 years. In that time, he went from working for CNM Network, to then becoming employed by Intermetro Communications, then Dial800, and then CDS/Reconnect Research ("CDS"). All of the above companies were California entities, and Morgan's work was exclusively in California.

In March of 2020, Morgan left CDS to go out on his own and form his own company in the field.  Accordingly, he founded Call Haven Partners, LLC, and has been operating that business continuously since its inception.

The basic business model for companies like Plaintiff is that they locate companies or individuals who have access to toll free phone numbers, and make arrangements that allow them to offer those toll free phone numbers to other companies or individuals who will then use the toll free phone numbers to market various types of business, services, or products.

During his employment with Dial800 (the predecessor to CDS), Morgan advanced from being a Telecom Specialist to becoming involved with Misdialed Calls. Eventually, Morgan was given the title of being the Chief Technology Officer.

### a.  Morgan's Departure from CDS

Over the years Morgan was promised well over a dozen times by, among others, the newly appointed CEO James Diorio and Richards, the Chairman of the Board, that Morgan would be compensated for what he had helped create, and for the millions of dollars of new revenue that Morgan had helped bring to the company. These promises never were fulfilled.

Ultimately, the company was sold to Sandra Tamler (herein "Tamler") who directed Richards to terminate all the buyers that she did not like, or was unwilling to do business with.  Richards complied and notified all major buyers that the company were going to shut them off from access to CDS sales. The resulting impact on the

company's revenue was dramatic. Prior to the sale to Tamler, Morgan had been informed that he was likely to be let go after Ms. Tamler acquired the company. However after the sale, instead of being terminated, Tamler had CDS create a new Agreement for all employees. The new employment agreement was completely unacceptable to Morgan, in that it would have required employees to remain on call 24 hours a day, 7 days a week, work on weekends, as well as in the office at least 5 days a week, along with a very strict non-compete clause. The agreement would have nullified all prior promises and commitments made by CDS to its employees, including Morgan. In conjunction with the new employment agreement, Tamler expressed an outright refusal to grant any additional salary increase, any partnership stake, or any additional suggestions, to/from Morgan. As a result, Mr. Morgan informed CDS that he could no longer work for the company and gave a notice of his intention to leave. After that, Morgan acquiesced to a 3 day transition period to help transition information. Morgan's last day working for CDS was March 4, 2020.

### b. Call Haven Partners, LLC and Allegations of Misappropriation

In the months and years preceding Morgan's departure from CDS he had been overworked and promised that he would eventually be rewarded. However, this all changed commencing with Tamler's involvement with CDS. Until his departure, Morgan committed the entirety of his effort to CDS.

In March of 2020, Morgan went to work for himself in the field and began operating Call Haven Partners, LLC ("Call Haven"). Plaintiff falsely alleges that Morgan and Call Haven have stolen trade secrets from Plaintiff and falsely solicited clients away from CDS thereby resulting in loss of substantial revenue.

Plaintiff claims that prior to the COVID-19 pandemic, CDS was routing several million misdialed calls in a typical month. Less than 10% of these misdialed calls were placed to numbers owned by CDS. The rest of the misdialed calls were placed to numbers held by CDS's suppliers. CDS also maintains that prior to the COVID-19 pandemic, airline misdials were the most profitable category for CDS.

Mr. Richards of CDS will testify that there has been a reduction of the sales for Plaintiff since Defendant Morgan's departure from the company. For example, Richards claims that Defendant Morgan induced one Jodi Carrier to cause "a supplier to stop supplying numbers to CDS and to supply those same numbers to Call Haven." Richards further claims, without evidence, that prior to his departure from CDS, Morgan *must have* contacted another major supplier and caused this CDS supplier, who was the owner of a very valuable number receiving misdials to a large issuer of credit cards, to stop doing business with CDS and give its numbers to Call Haven. Plaintiff alleges Morgan did this by taking advantage of confidential information about the terms of the contract that CDS had with this supplier and using that confidential information to offer more favorable terms to the supplier thereby enticing the supplier to switch from CDS to Call Haven. Richards also alleges without evidence, that five (5) additional "suppliers" ceased doing business with Plaintiff since the Covid-19 outbreak, and baselessly attributes it all to Defendants.

Plaintiff also falsely maintains that Morgan misappropriated CDS'S proprietary trade secrets and confidential information which includes a Toll-Free Number Algorithm ("TFNA"). TFNA, which was created by Morgan for his own use, analyzes the countless different ways that an individual could misdial a given 10 digit phone number. Morgan utilized that data to create a target list of toll-free numbers to obtain from a pool or database that is released every evening by an organization known as SOMOS. Plaintiff alleges that Morgan misappropriated the TFNA, which was stored on his laptop. For the sake of clarity, there is no dispute Morgan was never asked to return the laptop that he had used during his employment with CDS. Had Morgan been asked to return any equipment or provide additional insight, he would have gladly done so. In March, 2020, after Morgan left CDS, he wiped the laptop clean of any information relating to CDS and gave it to his children to use for school work and games. Unfortunately, CDS now maintains that the act of wiping the laptop was in furtherance of the Defendants' alleged misappropriation.

### c. Defendants Have Not Misappropriated Anything and Plaintiff's Alleged Damages, If they Exist, Are Self Inflicted

Although CDS falsely alleges Morgan and Call Haven have misappropriated customers and confidential information from CDS resulting in substantial revenue loss, the facts and evidence demonstrate otherwise.

#### i. Facts Re: CDS Loss of Revenue

Mr. Richards' businesses had been struggling economically for years. The businesses at one point had 50 employees who were conducting sales efforts for Mr. Richards under the business name "Dial800" which included Mr. Morgan. Over time, Dial800 suffered a downturn in business, mostly due to Mr. Richards' failure to understand the nature of the industry, and his mistreatment of his employees. Eventually, Mr. Richards started two new companies, Plaintiff herein, CDS, and a separate company called Reconnect Research (herein "RR"). RR's business was to conduct research with the phone calls as the greatest profit for call monetization, and acted as the face and buyer of the Research contracts, and would work with CDS to build the surveys and supply the phone calls for RR to conduct the surveys.

As time progressed, Mr. Richards again had difficulty running the business and needed a significant cash infusion into the business, and was forced to seek investors who could keep the company afloat.  Eventually, in the last quarter of 2019, Mr. Richards began negotiating with Sandra Tamler and reached an agreement with her. As part of that deal, Mr. Richards provided Ms. Tamler control of the company.

Once the deal with Ms. Tamler was completed, she indicated that she was going to eviscerate the CDS Company, but protect RR for her own interests.  She instructed Mr. Richards that the company was to terminate all the buyers that she didn't like. Mr. Richards quickly complied and notified several of the Company's major buyers that it was going to shut them off.  This caused a significant reduction in the business and revenue of CDS. It became clear early on that Ms. Tamler was not interested in the CDS business, but only wanted the RR business.

At the beginning of January, 2020, Ms. Tamler made a demand to shut off all CDS business that could be considered dangerous or harmful to her or to RR business. These were major changes that crippled tens of thousands of dollars of profitable business, as well as causing irreparable harm to many of CDS's existing suppliers and buyers. These changes were made without consent or notice to CDS suppliers or buyers. Upon receiving a backlash of complaints, CDS made contact with suppliers and let them know that they were going to be seeing a considerable decrease in their payouts as CDS started blocking all of their numbers and traffic.

As a result of Ms. Tamler's dictates, CDS went from having one of its best revenue months in December 2019, to one of its worst months in January 2020.

Finally, CDS's admits its buyers include a variety of businesses in different industries, including but not limited to companies selling cruise vacations, airline tickets, auto insurance, and legal services. However, Plaintiff's claims do not address or otherwise ignore that the entire planet was economically paralyzed due to the Covid-19 outbreak since at least the latter part of January, 2020, and that the travel industry, including cruise lines and airlines have been decimated by the incredible downturn in business across the world. Travel and related facets of that industry have been affected the most dramatically. For example, auto insurance industry has been staggering, resulting in rebates and reduction in policy premiums, etc.

      ii.  *CDS'S Allegations Of Proprietary Trade Secrets Do Not Withstand Scrutiny*

      1. Routing Technology

In April 2020, the month following Morgan's departure, CDS cancelled a critical contract with a company called NoveltySoft which was the developer of the routing technology Plaintiff claims Mr. Morgan was the primary architect of. The termination resulted in the loss of all access to software developed over the course of the preceding 4 years that Morgan had been employed by CDS.

CDS'S claim that it developed a unique and proprietary computer software

system to route misdial calls is based on a lack of understanding at best.  Every Buyer and Supplier has their own system on how they route calls, each in their own right can be unique and successful.  A vast majority of suppliers are using a mutual partner "RouteTrust" to route all of the misdialed calls.  Upon his giving over the Toll-Free Number Algorithm tool to Ms. Tamler in January, Mr. Morgan was told that Ms. Tamler already had superior ways to identify a vast majority of the numbers Mr. Morgan's tool came up with, and she outright rejected its use, effectively abandoning it.

### 2.  Toll-Free Number Algorithm

Plaintiff also claims that Morgan misappropriated a unique and proprietary Toll-Free Number Algorithm ("TFNA") he developed while he was employed by CDS. The TFNA was used by Morgan on behalf of CDS to identify potentially profitable toll-free numbers obtained from a pool or database that is released every evening by an organization known as SOMOS.

There is nothing secret or proprietary about the TFNA. To begin, the phone numbers provided by SOMOS are publicly available, which is not a trade secret. There are also a limited number of permutations that can be made from any given phone number.  These permutations cannot include a 1 or a 0 in the first digit location, nor a 1 or a 0 in the fourth digit location. Thereafter, anyone can compute all of the potential variations on any given 10 digit telephone number.  It may be tedious, but it is simple math. There is nothing secret or proprietary about math. Rather, the TFNA is built on simple logic and "public information".

Further, CDS' suppliers know who CDS works with/sells calls to, and CDS's buyers know other buyers that CDS is working with. This is not a secret. No supplier cares in particular where their calls are being routed, they only care about the payout, and the broker that is working with them, knowing they have their best interest at heart.

While working for CDS, Mr. Morgan dealt with many suppliers who provided

him summary information on his bank of numbers, which information was provided to many suppliers, and not held in confidence. Suppliers commonly share their bank of numbers to see if anyone will pay them more for them. The most profitable numbers can be found all by searching public information. Furthermore, suppliers know their own inventory of numbers, and which numbers are most profitable. Suppliers commonly send other people in the industry their own inventory of numbers, along with how much money they are currently making on each one, that are already pre-identified, and provided to by CDS.  These numbers are not secret nor can they be found exclusively through some alleged trade secret or proprietary information that CDS supposedly owns. Many of CDS'S suppliers were provided daily, weekly reports of their numbers and payouts per numbers and many of them knew exactly what numbers they had and how much they were looking to make for each call or for outright use for the month of the number.

Plaintiff maintains that CDS, through Morgan "updated and improved the algorithm used in TFNA. The unique and confidential TFNA used by CDS was an integral part of CDS's success."  In truth, this was nothing more than updating of new public numbers into a database that the script used. It was a low maintenance type of tool.

Finally, and most importantly, Morgan is simply not using, and has not used or misappropriated the TFNA. Plaintiff's allegations that Morgan is actively stealing the TFNA system and selling it to suppliers is a thinly veiled effort to eliminate market competition. ***Furthermore, CDS itself isn't using the TFNA either***. 18 U.S.C. § 1836(b)(1) provides that the alleged trade secret must be related to a product or service used in, or intended for use in, interstate or foreign commerce. It is no secret that CDS was never interested in using the TFNA. "This statutory element carries forward the common law requirement of competitive advantage." *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1090 (9th Cir. 1986) The requirement that [information] must have economic value to qualify as a trade secret has been interpreted to mean

that the secrecy of this information provides a business with a 'substantial business advantage' and here, CDS'S lack of interest in the TFNA does not translate to independent economic value.

### 3. Former CDS Suppliers/Pricing

On April 1st, Morgan determined that working in the online space was a direction that he wanted to take his new company. Morgan started establishing online websites to drive Search Engine Optimizations and acquire new and unique lead sources. This is an area of the industry that CDS has never engaged in. Furthermore, Airline and Auto insurance calls are widely known in the industry as the highest value calls. Most suppliers and buyers are aware of this. It is not a "trade secret."

Morgan never caused another supplier to stop doing business with CDS. While he is aware that several suppliers that left CDS prior to his leaving CDS, he understands that they started working with another CDS competitor, not Mr. Morgan or his company, after Mr. Richards refused to pay the Suppliers' demands. Neither Mr. Morgan nor Call Haven is targeting CDS, and suppliers' numbers are not CDS' property because the players in the industry are common knowledge.

Nonetheless, Plaintiff claims that "suppliers of misdialed numbers are extremely difficult to find." However, evidence demonstrates that everyone in the industry knows who the suppliers of misdialed numbers are. CDS has 35 suppliers, and several other competitors have quite larger lists of suppliers. There are well over 100 different companies that engage in the business of the parties to this litigation and many of the same wholesalers know all of these suppliers.

Likewise, there is nothing secret about industry pricing. Generally, revenue to a business such as CDS comes from a pre-qualified leads that can be negotiated at any price and any duration of the call. Suppliers negotiate these rates on their own as it's a well-known term to ask, for example, "how much for 90+second calls"?  The price is always variable and nothing is set in stone, nor is it secret. In the vast majority of cases, the suppliers are the ones who know their own price, and demand that the buyers

pay them a certain amount.  Rarely do suppliers not know exactly how much their calls are worth.

Plaintiff's loss of business is not because Defendants have solicited away its customers, but rather because the company voluntarily ceased doing business with many of them when Ms. Tamler took over, and because CDS has a reputation of being difficult to deal with and refuses to maintain competitive pricing in the industry. Neither Mr. Morgan nor Call Haven Partners, LLC, are engaged in unlawful conduct, and are in no way trying to cause any harm to CDS.  On the contrary, it is CDS who, by this lawsuit, is seeking to unlawfully restrain competition.

## II.     PLAINTIFF'S CAUSES OF ACTION

### a.  Defend Trade Secrets Act ("DTSA")

The DTSA provides a private civil cause of action for victims of trade secret espionage or theft where a trade secret has been misappropriated, and requires that the misappropriated trade secret is related to a product or service used in, or intended for use in, interstate commerce. *See* 18 U.S.C. § 1836.

#### i.  *Prima Facie Element of the DTSA: Defining "Trade Secret"*

In passing the DTSA, Congress intended to create a unified definition of what constitutes a trade secret and a separate federal cause of action for misappropriation of trade secrets. Under subsection 1839, a trade secret is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839. Court have implied or even expressly held that the definition of a trade secret is the same under the DTSA and state trade secret law.

Additionally, section 1839 further requires that trade secret owners must take certain measures in order for the information at issue to maintain protection as a

trade secret under the DTSA:

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839.

The information at issue is <u>not trade secret</u>, but even if it were, protection of the information at issue was destroyed because <u>CDS did not take "reasonable measures to keep their information secret."</u> Whether measures taken by trade secret owners are "reasonable" highly depends on the specific facts of each case, including the technology used, the industry, and how sophisticated the parties are. For example, in *Weride Corporation v. Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019), the Court held that restricting access to a source code by logging-in, encrypting the source code, and requiring employees to sign a proprietary information and inventions assignment agreement was sufficient to meet the reasonable measurement standard. Here, Plaintiff has taken no such measures of anything alleged to be a trade secret.

Furthermore, the alleged trade secret information is "readily ascertainable" to the general public and particularly to players in the industry.

### ii. Damages

Courts have also consistently insisted that Plaintiffs establish the causal relationship between the trade secrets misappropriated and the damages pled. For example, in *02 Micro Inter. Ltd. v. Monolithic Power Systems, Inc.*, 399 F.Supp.2d 1064 (N.D. Cal. 2005), the Court warned the Plaintiff before trial that if it failed to obtain trade secret findings on all of its alleged trade secrets, it would lose its trade secrets damages award <u>unless it presented expert evidence apportioning the damages on a trade secret-by-trade secret basis</u>. Despite the court's express admonition, the

Plaintiff did not offer expert testimony on apportionment, causing the court to vacate the jury's trade secrets damages award after the jury found that only some of the alleged trade secrets were protectable.

Here, Plaintiff cannot show its alleged damages are casually related to any alleged misappropriation. In fact, Plaintiff's reduction in business and revenue is self-inflicted and/or a reflection of general economic conditions.

### b. Uniform Trade Secrets Act ("UTSA")

California, like many states, adopted UTSA and incorporated it into the California Civil Code in 1984. The code defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that:

- Derives independent economic value from not being generally known by others and is not reasonably and independently ascertainable on one's own;

- Is the subject of "reasonable efforts" to maintain its secrecy.

Courts have defined "reasonable efforts" to include "advising employees of the existence of a trade secret, limiting access to the information on a 'need to know basis,' requiring employees to sign confidentiality agreements, and keeping secret documents under lock." Requiring employees, contractors, visitors and other people who may come into contact with trade secret information to sign confidentiality or non-disclosure agreements help to ensure that the information retains its trade secret status, because such agreements impose on their signers a contractual duty not to disclose the information. *Leatt Corp. v. Innovative Safety Tech., LLC*, 2010 W.L. 1526382 (2010) citing *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995); *MAI Systems Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir. 1993).

#### i. Client and Customer Lists as Trade Secrets

The DTSA defines a trade secret as all forms and types of "financial, business, scientific, technical, economic, or engineering information." Historically, California courts have protected customer lists to the extent they are "compilations," not a random set of customers. *Steinberg Moorad & Dunn Inc., v. Dunn,* 136 Fed.Appx. 6, 2005 WL 712487, at * 12 (Cal. 2005) (where sports firm "client list information was available to all agents" it was <u>not</u> a protectable trade secret).

As discussed in conjunction with the preceding cause of action, Plaintiff took no measures to protect its alleged trade secrets because there is nothing secret, confidential or proprietary about the information. Thus, Plaintiff saw no need to protect it. Contrary to assertions made by Plaintiff, Morgan does not admit he used CDS's private customer information to solicit CDS' customers for himself and his business.

### c.  Alleged Spoliation of Evidence

The evidence will show Morgan left the employ of CDS on March 4, 2020 and that CDS was never concerned enough about the material on the Microsoft Surface Pro laptop (the "Laptop") to ask Morgan to return it. Nor did CDS ever express any concern about the Laptop until commencement of this lawsuit.

In response to CDS' indifference, Morgan assumed CDS abandoned anything having to do with the Laptop and gave it to his children to play games, watch videos and make recordings. However, before doing so, Morgan purchased a new Dell XPS laptop for himself and his business on March 7, 2020 and a Microsoft 365 subscription on March 17, 2020. *See* Trial Exhibits 753, 754. Morgan also wiped the Laptop via factory reset to delete all of the information thereon and start anew.

From early March 2020 to October 10, 2020, Morgan allowed his children to use the laptop for entertainment and schoolwork. In October 2020, Morgan saw a report that authorities were warning parents to be on the lookout for child predators using the internet and on-line presence as a medium for nefarious activity. Knowing

that the Laptop was devoid of any information relevant to this litigation and that it contained private recordings, identification and information relating to his children, Morgan wiped the Laptop again on October 10, 2020.

In deciding whether to impose sanctions, "the most critical factor is not merely delay or docket management concerns, but truth. What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the [violation] threaten[s] to interfere with the rightful decision of the case." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007) (citations omitted) (internal quotation marks omitted). *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir. 1983) ("Sanctions interfering with a litigant's claim or defenses violate due process when imposed merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case.").

In the matter at hand, there was never anything of significance on the Laptop and even if there had been, CDS's abandonment of the Laptop and the information thereon, precludes the information wiped from the Laptop from being classified as trade secret information because there were no reasonable measures taken to maintain its secrecy. *Weride Corporation v. Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019) As a consequence of CDS' abandonment of the Laptop, Morgan wiped the Laptop of any information relevant to this case in March 2020, and gave the Laptop to his children. The only information wiped from the Laptop on October 10, 2020, was private recordings, identification and information relating to Morgan's children which has no relevance or bearing on the underlying truth in the case at hand. For these reasons, the Court must proceed with caution in connection with Plaintiff's spoliation allegations.

### d. Breach of Fiduciary Duty of Loyalty

"It's no longer the case in California that a claim for . . . breach of duty of loyalty based upon the misappropriation of trade secrets would survive even though both

13

claims require proof of 'additional elements' like a relationship of trust or confidence." *Whiteslate, LLP v. Dahlin*, No. 20-CV-1782 W (BGS) (S.D. Cal. July 7, 2021) quoting *Mattel, Inc. v. MGA Ent., Inc*., 782 F.Supp. 2d 911, 986 (C.D. Cal. 2011). The California Court of Appeals has held that CUTSA "supersedes any claim 'based on the same nucleus of facts as the misappropriation of trade secrets claim,' even though the superseded claim may seek 'something more.'" *Id.* quoting *K.C. Multimedia, Inc. v. Bank of Am. Tech. and Operations, Inc*., (2009) 171 Cal.App. 4th 939, 958. CUTSA preempts Plaintiff's breach of the duty of loyalty claim because it is based on the same nucleus of facts as its misappropriation of trade secrets claim. See *Whiteslate, LLP v. Dahlin*, No. 20-CV-1782 W (BGS) (S.D. Cal. July 7, 2021) quoting *Mattel*, 782 F.Supp. 2d at 986.

More importantly, *even if* Morgan had a duty fiduciary duty of loyalty, evidence shows Morgan never did anything that could be considered a breach of that duty.

### III.   MORGAN'S COUNTERCLAIMS

Morgan has asserted counterclaims against CDS under California employment law and common law. (See Answer and Counter-claims EFC No. 30.)

### a.  Morgan Is Entitled To Paid Time Off ("PTO")

While there is no legal requirement in California that an employer provide its employees with either paid or unpaid vacation time, (*Owen v. Macy's, Inc.,* 175 Cal.App.4th 462, 468, (2009)) if an employer does have an established policy, practice, or agreement to provide paid vacation, then certain restrictions are placed on the employer as to how it fulfills its obligation to provide vacation pay. Cal. Labor Code, § 227.3 requires the employer to pay as wages any "vested" vacation time a terminated employee has not used. *McPherson v. EF Intercultural Foundation, Inc*, (2020) 47 Cal.App.5th 243. Cal. Labor Code § 227.3 provides:

"Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested

vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination. The Labor Commissioner or a designated representative, in the resolution of any dispute with regard to vested vacation time, shall apply the principles of equity and fairness."

In *Suastez v. Plastic Dress-Up Co.* 31 Cal.3d 774 (1982) the California Supreme Court addressed the issue of *when* the right to vacation "vest[s]" under section 227.3. The Court held, "The right to a paid vacation, when offered in an employer's policy or contract of employment, constitutes deferred wages for services rendered. Case law from this state and others, as well as principles of equity and justice, compel the conclusion that a proportionate right to a paid vacation 'vests' as the labor is rendered. Once vested, the right is protected from forfeiture by section 227.3. On termination of employment, therefore, the statute requires that an employee be paid in wages for a pro rata share of his vacation pay." *Id.* at p. 784.

Under California law, earned vacation time is considered wages, and vacation time is earned, or vests, as labor is performed. *Id*. For example, if an employee is entitled to four weeks (20 work days) of vacation per year, after six months of work he or she will have earned ten days of vacation. Vacation pay accrues as it is earned, and cannot be forfeited, even upon termination of employment, regardless of the reason for the termination. S*uastez v. Plastic Dress Up* (1982) 31 Cal.3d 774. Upon termination of employment all earned and unused vacation must be paid to the employee at his or her final rate of pay. Cal. Labor Code § 227.3

While CDS claims that it had a written policy that provided its employees with unlimited Paid Time Off, any such policy was not honored by CDS, and all efforts of Mr. Morgan to take time off were rejected by his employer. CDS offers a document that it contends is CDS's unlimited PTO policy which states that, effective April 1, 2016, instead of accumulating accrued PTO (which seems to have been the previous

practice), exempt employees had an "open availability of time to use at their discretion." However, the policy is for Dial800 (the predecessor company to CDS) and not for CDS itself. CDS never had a written time off policy that was ever communicated to the employees and cannot produce a signed [PTO] policy because it did not exist. Nonetheless, CDS's vacation policy was an implicit part of employment corroborated by, albeit broken, promises.

In *McPherson v. EF Intercultural Foundation Inc.* (2020) 47 Cal. App. 5th 243, the California Court of Appeal held that under the particular facts of the case, the requirement to pay at separation can apply to what the employer maintained was an unlimited paid time off policy.  Like EF Intercultural Foundation Inc., ("EF") CDS had a policy of providing paid vacation or time off to employees, including Morgan, therefore, triggering the first prong of section 227.3: "whenever . . . [an] employer policy provides for paid vacations . . . ." It also is undisputed that CDS did not promise Morgan a specific amount of paid vacation that he would accrue over time or expressly tell him was limited to a maximum amount of paid time off. Thus, the second prong of section 227.3 has been triggered. That prong states "and an employee is terminated without having taken off his vested vacation time". Once CDS opted to provide employees including Morgan with paid vacation, by default that paid time off constituted additional wages attributable to the services Morgan rendered during the year, vesting as he labored under *Suastez. Suastez, supra,* 31 Cal.3d at pp. 779, 782, 784 ("all vacation pay is vested when earned").

Like the employer in *McPherson v. EF Intercultural Foundation Inc.*, CDS's policy was to promise employees some fixed amount of vacation time. As in the *McPherson* case, CDS expected Plaintiffs to take vacation in the range typically available to corporate employees (such as two to six weeks), not an "unlimited" amount—for example, more than would be available under a traditional accrual policy. The *McPherson* court concluded "the best approach is a more straightforward one: 20 days of vacation vested annually for each plaintiff, and any unused portion is

payable at termination." *See McPherson, supra*, 47 Cal. App. 5th 243, 254 *citing Church v. Jamison* (2006) 143 Cal.App.4th 156. The court based its conclusion on law and equity under section 227.3. As a legal determination, the Court found the evidence demonstrated 20 days' annual vacation was available to plaintiffs under EF's policy. Under principles of equity and fairness, the court stated it was "attempting to provide plaintiffs with adequate compensation for unused vacation time, without over-compensation, in circumstances where the amount of vacation time available was not expressly defined." In the case at hand, although CDS's "policy" was to allow liberal use of vacation time, the actual amount of PTO Morgan was *allowed* to take was nominal compared to what he was promised. Morgan's unused PTO vested during his employment with CDS and he should be compensated accordingly. The facts in the *McPherson* case are analogous those at hand, and illuminate a clear path for the direction of this case. Accordingly, Morgan should be credited with 20 days paid vacation from January 2014 through March 2020 (approximately 122 days).

As of the last date he worked for CDS, Morgan had accumulated unpaid Paid Time Off. To date, Morgan has not been paid for any of that.

### b. Morgan Is Entitled To A Fact Determination On Waiting Time Penalties

Strong public policy in California has long favored the full and prompt payment of wages due an employee. "It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due." *Kerr's Catering Service v. Department of Industrial Relations* 57 Cal.2d 319, 326, (1962) (internal quotes omitted).

To ensure that employers comply with the laws governing the payment of wages when an employment relationship ends, the California Legislature enacted Cal. Labor Code § 203 which provides for the assessment of a penalty against the employer when

there is a willful failure to pay wages due the employee at conclusion of the employment relationship.

To be at fault within the meaning of Cal. Labor Code § 203, "the employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due. As used in section 203, 'willful' merely means that the employer intentionally failed or refused to perform an act *which was required to be done.*" *Barnhill v. Robert Saunders & Co.* 125 Cal.App.3d 1, 7 (1981); *Mamika v. Barca,* 68 Cal.App.4th 487, 493 (1998). "The settled meaning of "willful" is that an employer has intentionally failed or refused to perform an act which was required to be done; the employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due." *Lopez v. United Parcel Service, Inc.*, 2010 WL 728205 (N.D. Cal. 2010).

Although CDS vocalized a liberal vacation policy, this was more about placating overworked employees. When it came time to actually use vacation time, Scott Richards always made it clear to Morgan that the company could not afford for him to be gone for any extended period of time. Therefore, Morgan's paid time off continued to accrue, unused, until termination of his employment. But when Morgan's employment came to an end CDS refused to pay Morgan for his vested PTO under the premise that it maintained an unlimited PTO policy. CDS now maintains Morgan is not entitled to wait time penalties under Cal. Labor Code § 203, and claims there is a "good faith" dispute which precludes the finding of willfulness. However, "defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.' " *Troester v. Starbucks Corporation* 387 F.Supp.3d 1019, 1030, (C.D. Cal. 2019) *order clarified on reconsideration* (C.D. Cal., May 21, 2019, No. CV1207677CJCPJWX) 2019 WL 2902487; *Villalpando v. Exel Direct Inc.* 2015 WL 5179486, at *36 (N.D. Cal., Sept. 3, 2015, No. 12-CV-04137-JCS).

**c.  Morgan's Breach of Contract Action**

18

CDS' argument that Morgan "admitted that he never entered into any type of written employment agreement with CDS, and instead, the idea of him receiving any "ownership interest" was just something that was "discussed" verbally and via e-mail" completely misses the point of Morgan's Breach of Contract counterclaim.

Morgan's Breach of Contract claim is not an ownership interest question, but the failure of CDS to pay the promised bonuses that were due. (See ¶ 76, Answer and Counterclaim) (ECF No. 30.)

Morgan will testify that the employment contract between he and CDS regarding the bonus were communicated to him both orally by Scott Richards, and via numerous email commitments made to Morgan regarding his bonus compensation. Morgan performed his side of that employment agreement by continuing to work for CDS until March of 2020.

The condition precedent of gross income sufficient to reach the required level was artificially manipulated by CDS in a fraudulent effort to deprive Morgan and other CDS employees of their bonus compensation. Numerous commitments were made to Morgan by Scott Richards and CDS that the bonus for 2018 & 2019 would be paid as due, but CDS manipulated the books to avoid paying that obligation. The evidence will show Morgan's entitlement to bonuses for 2018 & 2019.

Respectfully submitted,

                                        LAW OFFICE OF MICHAEL P. RING & ASSOC.


Dated: March 23, 2022          By ___*Michael P. Ring*_____
                                        MICHAEL P. RING
                                        ATTORNEYS FOR DEFENDANT
                                        DARYL MORGAN, AN INDIVIDUAL;
                                        CALL HAVEN PARTNERS, LLC, A
                                        CALIFORNIA LIMITED LIABILITY
                                        COMPANY

# PROOF OF SERVICE
## STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

I am employed in the County of Santa Barbara, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1234 Santa Barbara Street, Santa Barbara, California, 93101.

On **March 23, 2022**, I served the foregoing document described as **DEFENDANTS DARYL MORGAN, AN INDIVIDUAL AND CALL HAVEN PARTNERS, LLC'S TRIAL BRIEF** on the interested parties in this action by placing ____ the original **XX** a true copy thereof as follows:

| | |
|---|---|
| Alton G. Burkhalter | Jonathan Landesman |
| Daniel J. Tamler | Hope Steidle Kildea |
| Joshua A. Waldman | Cohen Seglias Pallas Greenhall & |
| Burkhalter Tamler Clement & George, | Furman PC |
| LLP | 1600 Market Street |
| 2020 Main Street, Suite 600 | 32nd Floor |
| Irvine, CA 92614 | Philadelphia, PA 19103 |
| aburkhalter@bkcglaw.com | jlandesman@cohenseglias.com |
| dTamler@bkcglaw.com | hkildea@cohenseglias.com |
| jwaldman@bkcglaw.com | *email only* |
| *email only* | |

__**XX**__ **BY ELECTRONIC MAIL TRANSMISSION**: via the United States District Court, Central District of California's CM/ECF system. I caused the listed documents to be electronically filed and subsequently emailed to the recipient(s).

__**XX**__ I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

**Executed on March 23, 2022, at Santa Barbara, California.**

__MICHAEL P. RING__             *Michael P. Ring*
Type or Print Name                    Signature